THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ALFRED McKAY, a/k/a Howard Beecham, Defendant-Appellant.

First District (2nd Division)   No. 1—93—2836

Opinion filed March 29, 1996.—Rehearing denied April 30, 1996.

Rita A. Fry, Public Defender, of Chicago (Lynn Flanagan Wilson, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Barbara L. Jones, and Judy L. DeAngelis, Assistant State's Attorneys, of counsel), for the People.

JUSTICE BURKE delivered the opinion of the court:

Following a jury trial, defendant Alfred McKay, a/k/a Howard Beecham,[1] was convicted of first degree murder and sentenced to 50 years' imprisonment. Defendant appeals his conviction and sentence, contending that the trial court (1) erred in admitting evidence of

---

[1]Defendant told the police that his name was Howard Beecham when he was arrested. Later he admitted his name was Alfred McKay. The record interchangeably uses both names. The notice of appeal filed in this matter, however, designates defendant's name as "Alfred McKay, a/k/a Howard Beecham," and we therefore use that appellation.

defendant's prior conviction for aggravated battery; (2) erred in admitting into evidence a life photograph of the victim; (3) erred in permitting improper comments by the State during closing argument; and (4) abused its discretion in sentencing defendant to 50 years' imprisonment. For the reasons stated below, we affirm.

At trial, Nick and Jonathan Mason testified that on February 5, 1992, they were standing with the victim, Tywan Murdock, in front of an apartment building at 50 East 50th Street in Chicago where Murdock lived. While standing there, a man, later identified as defendant, exited the apartment building. As he was exiting, defendant asked Murdock, Nick and Jonathan if they knew a man named Kenya. Murdock asked why defendant wanted to know about Kenya because Kenya was Murdock's younger brother. Defendant replied that Kenya was "messing with" defendant's cousin, Crystal, and insisted that someone tell him where to find Kenya. Nick, Jonathon and Murdock told defendant they did not know anything about Kenya. At that time, James Jones, a friend of Nick, Jonathan and Murdock, approached the group. Nick told defendant to "just forget it," to which defendant responded, "you're being tough, step in the hallway." When Nick refused, defendant stepped back into the apartment building, keeping the front door to the building open slightly with his foot. After a few seconds, defendant emerged from the building holding a small black gun. Defendant then grabbed Murdock by his jacket collar and put the gun to Murdock's head. Nick told defendant "it was not worth it" and asked defendant why he was holding a gun to Murdock's head. Defendant then waived the gun at everyone else and defendant again told Nick to go into the hallway. Nick refused again and defendant dragged Murdock inside the apartment building and closed the door. Nick, Jonathan and James then all heard three shots from behind the door. They entered the hallway and saw defendant running up the stairs and Murdock lying on the floor behind the door. Nick sat on the steps, picked up Murdock's head and held it in his arms. According to Nick, Murdock was gasping for air, his eyes flipped back in his head and he stopped breathing.

Claude Dunlap, a Chicago police officer, testified that he and his partner, Officer Larry Stewart, were driving by 50 East 50th Street when two or three black males ran to their car screaming that someone had been shot. They went to the building, entered the hallway and saw Nick on the steps with Murdock's head in his lap. Dunlap checked to see if Murdock had a pulse and felt none. He then observed that Murdock had been shot twice, once in his chest and once in his stomach. There were no weapons in the area. Dunlap further stated

that someone at the scene informed him that defendant had run up the stairs to the third floor and that he would probably use the back door exit.

Dunlap and Stewart then went to the third-floor apartment, announced themselves and demanded that they be let into the apartment. They waited approximately 5 to 10 minutes before they were admitted. Inside the apartment they questioned Eric McKay and Venita Mason about defendant. Dunlap then returned to where Murdock was and searched the area again. No weapons or money was found near Murdock's body.

Jonathan Mason testified that, after the shooting, his older brother, Pete Mason, approached the apartment building and asked Jonathan what had happened. Jonathan told Pete that Murdock had been shot and described defendant to him. Pete then said that that "looked like the guy that just ran past [me]" through the alley.

Peter Mason testified that prior to seeing defendant in the alley, he had observed him being helped out of the rear door of the apartment building by another man.

Chicago Detective Stephen Glynn testified that he, along with his partner, Detective George Carey, arrived at the scene of the murder and searched Murdock's body, the stairwell and the alley. Detective Glynn did not find a gun and found only "loose change" in Murdock's pockets. The detectives determined from their investigation that defendant had shot Murdock.

On February 11, 1992, Nick and Jonathan Mason and James Jones were taken to the police station at 51st and Wentworth, where they were questioned about Murdock's murder. They were each shown photographs of six different men and each separately identified defendant as the man who had shot Murdock.

On March 1, Officer Darin Macon was instructed to go to 6364 King Drive in Chicago to find and arrest defendant. Officer Macon, along with Officers Peck, Corbin and Anderson, went to the apartment located at that address and knocked on the door. A woman answered the door and the officers told her they were looking for Alfred McKay. She told the officers that there was no one there by that name but that they could come inside. There were two black males inside. The officers asked defendant what his name was and he replied, "Howard Beecham." The officers asked him if he was also known as Alfred McKay and he said, "No." The officers then took defendant to the police station, where he was fingerprinted.

On March 2, Nick and Jonathan Mason and James Jones were again taken to the police station to view a lineup including defendant. All three men identified defendant as the man who had shot Murdock.

Nancy Jones, M.D., an assistant medical examiner, testified that she performed an autopsy on Murdock. Dr. Jones found three gunshot wounds on Murdock's body—one in his left front chest, one in the left upper abdomen region and the third in the left upper back region. According to Dr. Jones, all three wounds were in a downward direction consistent with the shooter being above Murdock. The State's exhibits 2 through 11, photographs of Murdock's gunshot wounds and of the bullets recovered from Murdock's body, were admitted into evidence.

Christine Murdock, Murdock's mother, testified that her son was 19 years old at the time of his death and was attending Harold Washington College. He had worked four days a week in the Shaw Furniture Store warehouse with his father. Christine identified a 1991 photograph of her son in his high school graduation gown, sitting in the driver's seat of a car. The State also presented a photograph of Murdock at his death. Christine further testified that on February 5, 1992, her son had the day off from work. She had left for her job at 10 a.m. on that day at which time her son was still sleeping. At 4 p.m., Christine's brother-in-law called and told her that her son had been shot.

Defendant testified in his own behalf. He stated that he drove to 50 East 50th Street on February 5, 1992, to see his uncle, who had paged him and lived at that address. As he approached the apartment building, he saw a group of men standing in front of it. One of the men asked defendant how much defendant's coat cost. Defendant could not recall specifically who asked the question but he responded to the question, went to the door of the apartment building and rang the doorbell. Defendant's uncle had to let defendant into the building because the outer door was locked.

Defendant went to his uncle's apartment, where he stayed for a few hours. Upon leaving the apartment, defendant saw Murdock and three other men on the stairs. Murdock asked defendant if he had change for a "C note." Defendant replied, "Yes," and went into his pocket for some change. Defendant then saw that Murdock was holding a gun in his hand. Murdock said, "Folks, secure me," and told defendant to give him his money and jewelry. Defendant further stated that the others left the building, leaving only defendant and Murdock inside. Defendant gave Murdock $1,300 and his jewelry, which Murdock put in his jacket pocket. Murdock then put the gun to defendant's neck. Defendant stated that he was standing on the stairs and that Murdock was below him. Murdock said he was going to kill defendant and began pulling defendant down the stairs. Defendant tumbled over Murdock and the two struggled over the gun. The gun

fired, fell to the ground, and defendant picked it up. Murdock was coming toward defendant "like he was about to do something to [me]." Defendant fired two shots at Murdock, ran upstairs and knocked on the door of a third-floor apartment. When no one answered the door, defendant ran back downstairs. Defendant saw a man standing in front of the door to the outside so he waited for a minute and then made a run for it out of the front door. Before running, defendant dropped the gun near Murdock's body. Defendant ran down the alley where he bumped into a guy. The guy fell down and defendant fell over him. Defendant got up and continued running north down the alley.

Defendant further testified that he never reported the incident with Murdock to anyone and that he used a different name when he was arrested because the "police had informed some of my family members that guys were looking for me and they were going to kill me" and because he "didn't want to come to jail and have to deal with the organization that Tywan Murdock was a part of." On cross-examination, defendant stated that two of the men originally with Murdock chased him down the alley.

After the defense rested, a sidebar was held in which a discussion ensued regarding introduction of evidence by the State of defendant's prior conviction for aggravated battery. The trial court commented that it did not think it had explicitly overruled defendant's pretrial motion to bar this evidence and then ruled that the motion was "heard and denied." The court further denied defense counsel's request that the prior conviction "simply read a felony." The State subsequently presented this evidence to the jury by reading from a certified statement of conviction that defendant "entered a plea of guilty to aggravated battery on January 19, 1990." The trial court then instructed the jury that the evidence could only be considered when assessing defendant's credibility and not as evidence of his guilt. The jury found defendant guilty of first degree murder. Following the jury's verdict, the trial court made the following remark to defendant:

> "Your testimony was patently perjurious. A factor that I will take into consideration at the time of sentencing. It was almost laughable that you could have thought the 12 people would have believed. That that [sic] is preposterous."

Defendant filed a *pro se* "Motion to Vacate Findings, Dismiss Proceedings or Grant New Hearings and/or Trial," arguing that the trial court erred in permitting certain prejudicial remarks by the State during closing argument. Defendant's counsel also filed a motion for a new trial on behalf of defendant, arguing that the trial

court erred in allowing the jury to view the life photograph of Murdock and in overruling defendant's motion to bar the use of defendant's prior conviction. Both motions were denied. At defendant's subsequent sentencing hearing, defendant's mother, girlfriend and mother of his two children, and two of his uncles testified in his behalf. The trial court sentenced defendant, who was 22 years old at the time, to 50 years' imprisonment. This appeal followed.

Defendant, relying on *People v. Williams*, 161 Ill. 2d 1, 641 N.E.2d 296 (1994), first contends that the evidence of his prior conviction for aggravated battery should have been excluded because it did not bear upon his truthfulness as a witness and the prejudicial impact of the evidence outweighed its probative value. Defendant further contends that he was also prejudiced by the trial court's refusal to delete the reference to the specific offense of aggravated battery and to replace it with the word "felony." The State contends that the evidence of defendant's prior conviction was properly admitted or, alternatively, that any error was harmless.

■ " '[T]he legitimate purpose of impeachment *** is *** not to show that the accused who takes the stand is a "bad" person but rather to show background facts which bear directly on whether jurors ought to believe him rather than other and conflicting witnesses.' " *Williams*, 161 Ill. 2d at 37, quoting *Gordon v. United States*, 383 F.2d 936, 940 (D.C. Cir. 1967). Pursuant to *People v. Montgomery*, 47 Ill. 2d 510, 268 N.E.2d 695 (1971), a defendant may be impeached with evidence of a prior crime only if the crime was punishable by death or imprisonment in excess of one year or involved dishonesty or a false statement regardless of the punishment, unless, in either case the trial court determines that the probative value of the evidence on the issue of the defendant's testimonial credibility is substantially outweighed by the danger of unfair prejudice. Evidence of a conviction is admissible only if it occurred within 10 years of the offense for which the defendant is charged. In determining whether the probative value outweighs the prejudicial effect, relevant factors to consider include the nature of the prior crimes, the length of the criminal record, the age and circumstances of the defendant and "above all, the extent to which it is more important to the search for truth in a particular case for the jury to hear the defendant's story rather than to know of a prior conviction." *Montgomery*, 47 Ill. 2d at 518. Additional factors are "nearness or remoteness of the prior crime, the subsequent career of the person and whether the crime was similar to the one charged." *Montgomery*, 47 Ill. 2d at 518, citing *Gordon*, 383 F.2d 936. A prior conviction may not be admitted for the purpose of showing a defendant's propensity to commit a crime or that a defendant is a "bad person." *Williams*, 161 Ill. 2d at 39-40.

In *Williams*, the defendant was charged with murder and the trial court allowed the State to present evidence of the defendant's prior conviction for voluntary manslaughter to impeach his credibility. On appeal, our supreme court held that the trial court erred in admitting the defendant's prior conviction. The *Williams* court found, based on the trial court's comments that the prior conviction was of "great probative value in a case of this nature" and it was "highly probative of the nature of the offense," that the trial court admitted the prior conviction "as being probative of the issue of defendant's guilt of the charged offense of murder, rather than as bearing upon defendant's credibility as a witness." *Williams*, 161 Ill. 2d at 40. In so finding, the *Williams* court emphasized that the State also failed to provide an explanation of "*the relation[ship required by Montgomery] between [defendant's] conviction and [his] testimonial credibility.*" (Emphasis added.) *Williams*, 161 Ill. 2d at 41.

In reaching its decision, the *Williams* court criticized the "increasingly mechanical application" with which courts apply the *Montgomery* rule and stated that "[t]he *Montgomery* rule does not *** allow for the admission of evidence of any and all prior crimes." *Williams*, 161 Ill. 2d at 39. The *Williams* court also criticized and rejected the practice by some courts of admitting evidence of prior convictions for impeachment purposes, where the prior felony has no direct relation to credibility, by employing "the rationale that a felony of any type evinces a disrespect for societal order and thus adversely affects the defendant's veracity. More specifically, the *Williams* court stated that this premise "does not comport with the principles expressed in *Montgomery*." *Williams*, 161 Ill. 2d at 39. Rather, according to the *Williams* court, "[t]he focus of *Montgomery* was on crimes which bear upon the defendant's truthfulness as a witness." *Montgomery*, 161 Ill. 2d at 39. " '[A]cts of deceit, fraud, cheating, or stealing *** are universally regarded as conduct which reflects adversely on a man's honesty and integrity,' " whereas acts of violence " 'generally have little or no direct bearing on honesty and veracity.' " *Williams*, 161 Ill. 2d at 37, quoting *Gordon v. United States*, 383 F.2d 936, 940 (D.C. Cir. 1967). The *Williams* court further stated that where evidence of a prior conviction does not relate to a defendant's testimonial credibility, prior conviction evidence may be admitted if relevant for some proper purpose other than impeachment.

In the case at bar, defendant's prior conviction for aggravated battery satisfies the first prong of *Montgomery*, *i.e.*, the offense for which defendant was charged was punishable by more than one year's imprisonment. Additionally, the prior conviction was within 10 years of the offense for which defendant was charged. However, as

the State concedes, aggravated battery is "deemed to be [a crime] of violence, rather than dishonest conduct" and, as we have previously stated, crimes of violence generally have no direct bearing on a defendant's veracity. The State also agrees that *Williams* "directs that the nature of the crime used for impeachment must bear upon defendant's truthfulness," although it contends that *Williams* is distinguishable from the present case. The State further maintains, relying on *People v. Rogers*, 264 Ill. App. 3d 740, 749, 636 N.E.2d 565 (1992), that defendant's prior conviction was admissible for impeachment purposes based on the *Montgomery* "recency" factor of defendant's prior conviction to the offense for which defendant was charged. More specifically, the State argues that the recency between defendant's prior conviction (two years) and his arrest for murder "impacts on defendant's credibility." The State does not provide any other explanation of the relationship between defendant's prior conviction and his testimonial credibility.

We first address the State's attempt to distinguish *Williams*. It asserts that in *Williams* the prior conviction was for voluntary manslaughter, "a crime of passion or unreasonable belief in self-defense," whereas in the case at bar the crime of aggravated battery "is a clear intent crime with no mitigating mental state whatsoever." However, *Montgomery*'s focus was on whether a prior conviction related to a defendant's testimonial credibility. We fail to see any relationship between a defendant's mental state during the commission of a crime and his veracity. The State's remaining "argument" in attempting to distinguish *Williams* is that "the Illinois Supreme Court could not have intended by its holding in *Williams* to exclude the use of a defendant's prior murder conviction for impeachment purposes. Any such exclusion would clearly violate the original dictates of *Montgomery*." These two sentences constitute mere assertions without argument or citation to authority and we therefore do not address them further. *People v. Hoffmann*, 140 Ill. App. 3d 1056, 489 N.E.2d 460 (1986).

We are aware, however, of the inconsistent interpretations of *Williams* within this court. See *People v. Bramlett*, 276 Ill. App. 3d 201, 658 N.E.2d 510 (1995); *People v. Elliot*, 274 Ill. App. 3d 901, 654 N.E.2d 636 (1995); *People v. Fomond*, 273 Ill. App. 3d 1053, 652 N.E.2d 1322 (1995). Based on the *Williams* court's statements, that "[w]e do not hold that there are no circumstances under which a voluntary manslaughter conviction may be admitted at a murder trial" and "we fail to see the relationship required by *Montgomery* between defendant's conviction and his testimonial credibility in this case"

(*Williams*, 161 Ill. 2d at 41), we believe that *Williams* does not limit the felonies referred to in the first prong of *Montgomery* to crimes of dishonest conduct, but rather only that any felony sought to be introduced for the purpose of impeachment of a defendant must bear some relationship to the defendant's testimonial credibility. In other words, the State must specifically show what aspects of the felony relate to a defendant's credibility for purposes of impeachment based on the factors enunciated in *Williams*. A court will then balance the probative value of the evidence on the issue of a defendant's credibility against the danger of unfair prejudice.

Here, the State has failed to provide an explanation, just as it similarly failed to do in *Williams*, of the relationship between defendant's prior conviction for aggravated battery and his testimonial credibility. We further observe that the recentness of defendant's prior conviction was of limited probative value of defendant's credibility. See *People v. Siebert*, 72 Ill. App. 3d 895, 903, 390 N.E.2d 1322 (1979). On the other hand, as defendant argues, introduction of his prior conviction could easily have persuaded the jury to believe that defendant had a propensity to commit the crime he was charged with, *i.e.*, if defendant committed one violent crime, he probably did so again. This belief would automatically overlap negatively on defendant's claim of self-defense. "[T]he introduction of evidence of other crimes to show or suggest a propensity to commit crime is an improper purpose and is prohibited." *Williams*, 161 Ill. 2d at 39. Accordingly, we find that any probative value of defendant's prior conviction for aggravated battery was outweighed by its prejudicial effect. The trial court therefore erred in admitting defendant's prior conviction. In light of our finding on this issue, we need not address defendant's additional argument that he was prejudiced by the trial court's refusal to refer to his prior conviction simply as a "felony."

■ We agree with the State, however, that this error was harmless in light of the overwhelming evidence of defendant's guilt based on the testimony of Nick, Jonathan and Pete Mason, as well as James Jones, police officers, detectives and the medical examiner. Contrary to defendant's claims that Murdock demanded defendant's money and jewelry, Murdock had a gun, defendant and Murdock fought over the gun and it went off, and defendant dropped the gun by Murdock, the jury apparently believed the State's witnesses more credible than defendant. Those witnesses testified that defendant dragged Murdock into the apartment building, shots were immediately heard thereafter, Murdock was then found lying on the floor of the building and defendant was seen running up the stairs and exiting the third floor, no gun, money or jewelry was found around Murdock's body,

defendant was identified twice from a photo array and in a lineup as the offender by three of the witnesses, and Murdock was shot while in a position in which the shooter was above him. Accordingly, the admission of defendant's prior conviction for aggravated battery could not have been a material factor in the jury's determination of defendant's guilt such that without the evidence of his prior conviction the jury's verdict would have been different.

Defendant next argues that the life photograph of Murdock in his high school graduation gown was improperly admitted into evidence. The State argues that the photograph was properly admitted as part of the *corpus delicti* of the murder and to corroborate the testimony of Murdock's mother.

The decision whether to admit a photograph into evidence is within the sound discretion of the trial court (*People v. Morgan* 142 Ill. 2d 410, 568 N.E.2d 755 (1991), *rev'd on other grounds*, 504 U.S. 719, 119 L. Ed. 2d 492, 112 S. Ct. 2222 (1992)) and that decision should not be reversed on appeal absent an abuse of discretion which is prejudicial to the defendant (*People v. Young*, 206 Ill. App. 3d 789, 564 N.E.2d 1254 (1990)). A life photograph of a victim may be admitted as part of the *corpus delicti* of the murder, as well as to corroborate testimony of a "life and death" witness. *Morgan*, 142 Ill. 2d 410, 568 N.E.2d 755. Further, a photograph which accurately depicts the victim prior to his death is admissible for purposes of identification of the deceased. *People v. Rainone*, 176 Ill. App. 3d 35, 530 N.E.2d 1026 (1988). To preserve an issue for review, a party must object at trial and raise the issue in a post-trial motion. *People v. Enoch*, 122 Ill. 2d 176, 522 N.E.2d 1124 (1988).

■ Defendant did not raise this issue in his motion for a new trial and, therefore, the issue is waived on appeal. However, even if we were to review the merits of defendant's argument, we find that the trial court properly admitted the life photograph of Murdock, pursuant to *Morgan*, as the *corpus delicti* of the crime and to corroborate the testimony of Christine Murdock. Further, Murdock's life photograph, taken in 1991, accurately represented him at the time of his death in January 1992 and, pursuant to *Rainone*, was properly admitted for the purpose of identification of the deceased. Murdock's mother had testified that Murdock was a college freshman. While it would have been preferable for Murdock not to be wearing a graduation gown in the photograph, the jury was already aware that Murdock had graduated high school.

Defendant next contends that the State improperly dwelled upon Murdock's family, education and job during closing argument. The State's specific remarks during closing argument were:

"[Defendant] took a 19-year old boy who graduated high school, who is on his way upward and he left him laying [sic] there in the vestibule of his house.

\* \* \*

He lived with his family at 50 East, 52 East 50th Street with his mother, his father, his sister, his brother. He was going to Harold Washington College, a freshman in college.

He was working side-by-side with his dad at Shaw's Furniture Company. On Wednesday, February 5th, 1992 he had the day off of work."

Defendant further argues that the State improperly commented three times during closing argument that Murdock was "on his way upward." The State contends that defendant waived this argument by failing to object at trial or, alternatively, that the comments were based upon the evidence and therefore proper.

A prosecutor's comments must be based on the evidence or reasonable inferences drawn therefrom. *People v. Henderson*, 142 Ill. 2d 258, 568 N.E.2d 1234 (1990). Prosecutors are permitted wide latitude in their closing arguments and the trial court's decision to permit certain comments will not be disturbed absent an abuse of discretion. *People v. Curtis*, 262 Ill. App. 3d 876, 635 N.E.2d 860 (1994). Even when a prosecutor's comment exceeds the bounds of proper remarks, the verdict will not be disturbed unless the remarks resulted in substantial prejudice to the defendant such that, absent the remarks, the verdict would have been different. *People v. Baptist*, 76 Ill. 2d 19, 389 N.E.2d 1200 (1979). A failure to object to prosecutorial comments at trial results in waiver of the issue on appeal. *Enoch*, 122 Ill. 2d 176, 522 N.E.2d 1124.

■ Defendant has waived this issue on appeal by failing to object during trial to the prosecutor's remarks. However, even if we were to review the merits of defendant's argument, we find that the State's comments were properly based on the evidence and reasonable inferences drawn therefrom. Defendant testified that Murdock robbed him, held him at gunpoint and threatened to kill him. Murdock's mother testified regarding Murdock's family, his education and his job. This evidence was properly admitted to rebut defendant's testimony regarding Murdock's alleged attack. The State's subsequent comments during closing argument were properly based on this evidence. Further, the State's comment that Murdock was "on his way upward" was a reasonable inference drawn from the testimonial evidence that Murdock had graduated from high school, was attending college and had a job.

Defendant lastly contends that his sentence was excessive given

his age, his minimal criminal history, and his potential for rehabilitation. The State contends that defendant has waived this issue on appeal by failing to raise it in a post-sentence motion or, alternatively, that defendant's sentence was proper.

Pursuant to statute, a defendant convicted of murder may be sentenced to not less than 20 years' and not more than 60 years' imprisonment. 730 ILCS 5/5—8—1(1)(a) (West 1992). A sentence within the statutory guidelines that is alleged to be excessive will not be disturbed on review unless it is manifestly disproportionate to the nature of the offense. *People v. Cabrera*, 116 Ill. 2d 474, 508 N.E.2d 708 (1987). Before the August 11, 1993, amendment to section 5—8—1(c) of the Uniform Code of Corrections (730 ILCS 5/5—8—1(c) (West 1992)), a defendant was not required to move for a reduction in sentence prior to appealing matters related to sentencing. *People v. Lewis*, 158 Ill. 2d 386, 634 N.E.2d 717 (1994). We note that sentencing in this case occurred before August 11, 1993.

■ Pursuant to *Lewis*, defendant has not waived this issue on appeal. However, defendant received a sentence of 50 years' imprisonment, 10 years less than the maximum sentence. Defendant has not shown why his sentence was manifestly disproportionate to his crime. Accordingly, we affirm defendant's sentence.

For the foregoing reasons, defendant's conviction and sentence are affirmed.

Affirmed.

HARTMAN, P.J., and DiVITO, J., concur.